Slip Op. 13 - 34

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THAI PLASTIC BAGS INDUSTRIES CO., LTD., <br><br>     Plaintiff, <br><br>     v. <br><br> UNITED STATES, <br><br>     Defendant, <br><br>     and <br><br> POLYETHYLENE RETAIL CARRIER BAG COMMITTEE, HILEX POLY CO., LLC, and SUPERBAG CORPORATION, <br><br>     Defendant-Intervenors. | **PUBLIC VERSION** <br><br> Before: Donald C. Pogue, <br>        Chief Judge <br><br> Consol. Court No. 11-00408 |

OPINION

[affirming in part and remanding in part the Department of Commerce's final results of antidumping duty administrative review]

Dated: March 19, 2013

    Irene H. Chen, Chen Law Group LLC, of Rockville, MD, and Mark B. Lehnardt, Lehnardt & Lehnardt, LLC, of Liberty, MO, for Thai Plastic Bags Industries, Co., Ltd, Master Packaging, Inc., and Inteplast Group, Ltd.

    Joseph W. Dorn, Stephen A. Jones and Daniel L. Schneiderman, King & Spalding LLP, of Washington, DC, for Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation.

    Vincent D. Phillips, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. Also on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Scott D. McBride, Senior

Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

**Pogue, Chief Judge:** This consolidated action seeks review of five determinations by the United States Department of Commerce ("Commerce") in the sixth administrative review of the antidumping duty order on polyethylene retail carrier bags from Thailand.[1] Specifically, Plaintiffs Thai Plastic Bags Industries Company, Limited ("TPBI") – a respondent in this review – and two importers of subject merchandise who participated in this review – Master Packaging, Incorporated, and Inteplast Group, Limited (collectively the "Importers") – challenge 1) Commerce's zeroing of, rather than deducting, negative normal-to-export price comparisons in the calculation of respondents' dumping margins; and 2) Commerce's decision, when calculating TPBI's general and administrative expenses, not to deduct income received from an export-conditional government rebate.[2] In

---

[1] See Polyethylene Retail Carrier Bags from Thailand, 76 Fed. Reg. 59,999 (Dep't Commerce Sept. 28, 2011) (final results of antidumping duty administrative review), amended by 76 Fed. Reg. 68,137 (Dep't Commerce Nov. 3, 2011) (amended final results of antidumping duty administrative review), amended by 76 Fed. Reg. 70,965 (Dep't Commerce Nov. 16, 2011) (correction to the amended final results of antidumping duty administrative review) (collectively the "Final Results") and accompanying Issues & Decision Mem., A-549-821, ARP 09-10 (Sept. 21, 2011) ("I & D Mem.").

[2] See Pls.' Rule 56.2 Mem. of L. in Supp. of Mot. for J. on the Agency R., ECF No. 48 ("TPBI & Importers' Br.").

addition, Plaintiffs Polyethylene Retail Carrier Bag Committee, Hilex Poly Company, LLC, and Superbag Corporation – members of the domestic like product industry who participated in this review (collectively the "Domestic Producers") – challenge 3) Commerce's decision, when calculating TPBI's general and administrative expenses, to include a particular gain from TPBI's sale of assets; 4) Commerce's adjustment of the surrogate financial statements used to construct respondent Landblue (Thailand) Company, Limited ("Landblue")'s normal value to reduce the reported selling expenses in proportion to Landblue's own direct to indirect selling expense ratio for export sales; and 5) Commerce's decision, when calculating Landblue's constructed profit, to use publicly available surrogate financial statements, rather than confidential information from TPBI.[3]

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006) and 28 U.S.C. § 1581(c) (2006).

As explained below, Commerce's Final Results are sustained with respect to both of TPBI and the Importers' challenges.  With regard to the Domestic Producers' challenges, Commerce's calculation of a constructed profit based on publicly

---

[3] See Rule 56.2 Br. of the Polyethylene Retail Carrier Bag Comm., Hilex Poly Co., LLC, and Superbag Corp. in Supp. of their Mot. for J. on the Agency R., ECF No. 49 ("Domestic Producers' Br.").

available surrogate financial statements is sustained, but Commerce's adjustment of these surrogate financial statements' direct selling expense ratio is remanded.  In addition, Commerce's inclusion of TPBI's asset sale gain in TPBI's general and administrative expense calculation is also remanded.

## STANDARD OF REVIEW

This court will uphold Commerce's antidumping determinations if they are in accordance with law and supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." SKF USA, Inc. v. United States, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (defining "substantial evidence")).  Moreover, the substantiality of evidence is evaluated "on the record as a whole, including [any evidence that] fairly detracts from its weight." Target Corp. v. United States, 609 F.3d 1352, 1358 (Fed. Cir. 2010) (internal quotation marks and citation omitted).  The "substantial evidence" standard of review can be roughly translated to mean "is the determination unreasonable?" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal quotation and alteration marks, as well as citation, omitted).

**DISCUSSION**

I.   <u>Zeroing</u>

In their request for review of Commerce's decision to zero negative normal-to-export price comparisons in the calculation of respondents' dumping margins, TPBI and the Importers make substantially the same arguments here as TPBI made in the preceding review. <u>Compare</u> TPBI & Importers' Br. at 13-17 <u>with</u> <u>Thai Plastic Bags Indus. v. United States</u>, __ CIT __, __ F. Supp. 2d __, No. 11-00086, 2013 WL 491520 (CIT Feb. 11, 2013) ("<u>Thai Plastic Bags II</u>") (adjudicating TPBI's challenge to Commerce's decision to zero negative price comparisons in the preceding review).  Commerce similarly provides the same explanation for its decision as that upheld by this Court in response to TPBI's challenge in that preceding review. <u>Compare</u> <u>I & D Mem.</u> cmt. 6 at 17-18 <u>with</u> <u>Thai Plastic Bags II</u>, __ CIT at __, __ F. Supp. 2d at __, 2013 WL 491520 at *3-4.  As the record of this review is not materially different from that of the preceding review, Commerce's decision not to aggregate the price differences of TPBI's above-normal value sales with the dumping margins of TPBI's dumped sales (while employing the average-to-transaction comparison method in this review) is affirmed on the grounds stated in <u>Thai Plastic Bags II</u>. <u>See</u> <u>Thai Plastic Bags II</u>, __ CIT at __, __ F. Supp. 2d at __, 2013 WL 491520 at *3-4.

II.   TPBI's Export-Conditional Government Rebate Revenue

When calculating TPBI's cost of production ("COP") in this administrative review,[4] Commerce rejected TPBI's argument that its general and administrative ("G&A") expenses[5] should be reduced by the value of a rebate that TPBI received from the Thai government (referred to as the "Blue Corner Rebate" or "BCR revenue"). See I & D Mem. cmt. 1 at 2, 5.  TPBI and the Importers claim that this decision was not supported by a reasonable reading of the evidence in the record. TPBI & Importers' Br. at 9-13.

---

[4] See 19 U.S.C. § 1677b(b)(1) ("Whenever [Commerce] has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product, [Commerce] shall determine whether, in fact, such sales were made at less than the cost of production.  If [Commerce] determines that sales made at less than the cost of production[] (A) have been made within an extended period of time in substantial quantities, and (B) were not at prices which permit recovery of all costs within a reasonable period of time, such sales may be disregarded in the determination of normal value. . . ."); Polyethylene Retail Carrier Bags from Thailand, 76 Fed. Reg. 30,102, 30,104 (Dep't Commerce May 24, 2011) (preliminary results of antidumping duty administrative review) (explaining that Commerce had "reasonable grounds to believe or suspect" that TPBI's Thai sales of foreign like product may have been made at prices below COP because Commerce found that TPBI made below-cost Thai sales in the most recent prior administrative review) (unchanged in the Final Results).

[5] See 19 U.S.C. § 1677b(b)(3)(B) (providing that the cost of production includes, *inter alia*, "an amount for selling, general, and administrative expenses").

But in its decision, Commerce explained that it did not deduct TPBI's BCR revenue from the COP calculation because the BCR revenue – which TPBI described as rebates received "upon export of TPBI's finished bags"[6] – "is related to export sales rather than the COP" and thus "adjusting production costs (or any component of the COP) with the BCR revenue [was] not appropriate." I & D Mem. cmt. 1 at 5.  More generally, Commerce reasonably concluded that the COP calculation concerns the respondent's home market,[7] whereas export-conditional rebates by definition are not available when the foreign like product is sold domestically.  Accordingly, Commerce properly excluded the export-conditional BCR revenue from the COP calculation when determining TPBI's normal value, consistent with Commerce's

---

[6] Case Brief of [TPBI] (June 23, 2011), Admin. R. Con. Doc. 45 [Pub. Doc. 88] ("TPBI's Case Br.") at 1 (citation omitted); see also id. at 1-2 ("The Thai Government pays these BCR rebates to refund import duties incurred in the manufacture of resin used to produce plastic bags for export.") & n.2 (explaining that the export-conditional BCR revenue refunded a fee charged to TPBI "by its domestic resin suppliers for the import duties the resin suppliers themselves incurred to produce the resin sold to TPBI").

[7] See 19 U.S.C. §§ 1677b(b)(1) (COP is calculated for "sales of the foreign like product under consideration for the determination of normal value"); 1677b(a)(1) (normal value is preferably the price at which foreign like product is sold in the exporting country).

treatment of Thai BCR rebates in other proceedings.[8] Cf. Saha Thai Steel Pipe (Public) Co. v. United States, 635 F.3d 1335, 1338 (Fed. Cir. 2011) ("[P]roducers remain subject to [an export-conditional] import duty when they sell the subject merchandise domestically, which increases home market sales prices and thereby increases [normal value].").[9]

---

[8] See, e.g., Polyethylene Retail Carrier Bags from Thailand, 75 Fed. Reg. 53,953, 53,955 (Dep't Commerce Sept. 2, 2010) (preliminary results of antidumping duty administrative review) ("We adjusted TPBI's reported [cost of manufacturing] to remove an offset claimed by TPBI for revenue associated with the Government of Thailand's Blue Corner Rebate program.") (unchanged in the final results, 76 Fed. Reg. 12,700 (Dep't Commerce Mar. 8, 2011)).

[9] Commerce noted that TPBI could have a sought an export price adjustment for the BCR revenue, pursuant to the duty drawback provision. See I & D Mem. cmt. 1 at 5; 19 U.S.C. § 1677a(c)(1)(B) ("The price used to establish export price and constructed export price shall be . . . increased by . . . the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States[.]"); Saha Thai Steel Pipe, 635 F.3d at 1338 ("[W]hen a duty drawback is granted only for exported inputs, the cost of the duty is reflected in [normal value] but not in [export price]. The statute corrects this imbalance, which could otherwise lead to an inaccurately high dumping margin, by increasing [export price] to the level it likely would be absent the duty drawback.") (citations omitted). TPBI did not claim such adjustment and Commerce determined that the record did not support a finding that the BCR revenue satisfied the relevant criteria. I & D Mem. cmt. 1 at 5; see Wheatland Tube Co. v. United States, 30 CIT 42, 47, 414 F. Supp. 2d 1271, 1276 (2006) ("Commerce explains that it has a long-standing practice of evaluating claims for a duty drawback adjustment . . . using a two-pronged test . . . requir[ing] the respondent to establish that (1) the import duties and rebates are directly linked to and are dependent upon
                                                    (footnote continued)

Because the record reasonably supports Commerce's finding that TPBI's BCR revenue was conditioned upon exportation,[10] this finding is supported by substantial evidence. See Consol. Edison, 305 U.S. at 229. And because rebates conditional upon exportation are not applicable to merchandise sold in the respondent's home market, Commerce reasonably determined that TPBI's export-conditional BCR revenue was not relevant to TPBI's COP when calculating normal value for TPBI's merchandise. Cf. Saha Thai Steel Pipe, 635 F.3d at 1338.

---

one another, and (2) there are sufficient imports of raw materials to account for the duty drawback received on exports of the manufactured product.") (citation omitted), rev'd on other grounds, 495 F.3d 1355 (Fed. Cir. 2007). Cf. Polyethylene Retail Carrier Bags from Thailand, Issues & Decision Mem., A-549-821, ARP 08-09 (Mar. 1, 2011) cmt. 3 at 20 ("TPBI's costs include a 'compensation fee' charged by resin suppliers to account for import duties in recognition of the fact that TPBI will be rebated the duties upon export of the finished bags under the BCR program. In other words, BCR revenues are import duties imposed by Thailand which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise. Thus, BCR revenues are analogous to duty-drawback revenues with the variant that there are three parties involved (the input supplier, the producer/exporter, and the foreign government) whereas, in a typical duty-drawback situation, there are only two parties involved (the producer/exporter and the foreign government).") (footnote and citation omitted) (denying duty drawback adjustment for BCR revenues because TPBI failed to establish entitlement under the two-pronged test); see also Circular Welded Carbon Steel Pipes and Tubes from Thailand, 77 Fed. Reg. 20,782, 20,784 (Dep't Commerce Apr. 6, 2012) (preliminary results of antidumping duty administrative review) (same).

    [10] See supra note 6.

Commerce's decision not to deduct TPBI's BCR revenue from the COP calculation is therefore affirmed.

### III. TPBI's Gain From the Sale of Assets

Next, the Domestic Producers challenge Commerce's decision to offset TPBI's G&A expenses[11] with the value of a particular gain from the sale of assets that was reflected in TPBI's financial statements. Domestic Producers' Br. at 7-10; see I & D Mem. cmt. 1 at 5-6.[12]  It is Commerce's practice to include in the G&A expense calculation gains or losses incurred on the routine disposition of fixed assets but to exclude non-recurring income or losses that are not part of a company's normal production-related business operations.[13]  Here, Commerce decided to include TPBI's asset sale gain in the G&A expense

---

[11] See supra notes 4-5.

[12] See also TPBI's Case Br., Admin. R. Con. Doc. 45 [Pub. Doc. 88], at 4 (claiming that "TPBI's 2010 financial statements demonstrate a gain of [[          ]] baht on the sale of assets") (citing Ex. S3ABCD-1 to TPBI's Submission of 2010 Financial Statements, A-549-821, ARP 09-10 (June 15, 2011), Admin. R. Con. Doc. 40 [Pub. Doc. 79] ("TPBI's Financial Stmts.") at 6 (showing [[          ]] baht next to [[          ]])).

[13] See, e.g., Stainless Steel Sheet and Strip in Coils from Mexico, Issues & Decision Mem., A-201-822, ARP 07-08 (Feb. 3, 2010) ("SSSS from Mexico") cmt. 8 at 44.  Commerce considers the nature, significance and relationship of an activity to the general operations of the company when determining whether or not it is part of a company's normal production-related business operations. Id.

calculation because Commerce found that this gain was attributable to "the routine disposition of assets." I & D Mem. cmt. 1 at 5-6. As discussed below, however, this decision is not supported by substantial evidence because Commerce did not address record evidence that fairly detracts from its conclusion. See Tudor v. Dep't of Treasury, 639 F.3d 1362, 1366 (Fed. Cir. 2011) (quoting Univ. Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.")).

As the Domestic Producers point out, "TPBI provided no information regarding the type of assets sold, and it made no claim or representation that sales of such assets were 'routine' or otherwise related to normal production operations." Domestic Producers' Br. at 8; TPBI's Case Br., Admin. R. Con. Doc. 45 [Pub. Doc. 88], at 4 (providing no detail regarding these asset sales beyond the general description of a certain gain "on the sale of assets"). Thus Commerce's conclusion that these sales were routine production-related dispositions was not supported by substantial evidence because it was based on speculation. Cf. Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'") (internal quotation marks and citation omitted).

Moreover, Commerce unreasonably concluded, without explanation, that there was "no evidence on the record to suggest that gains on the sales of assets reported in TPBI's audited financial statements are attributable to anything other than the routine disposition of assets." I & D Mem. cmt. 1 at 5-6. On the contrary, the Domestic Producers present a reading of the information contained in TPBI's (confidential) financial statements that fairly detracts from Commerce's conclusion that these asset sales were routine production-related dispositions.[14]

---

[14] Specifically, the size of the gain suggests it was not from operating assets. TPBI's financial statements list both [[


]] and [[
                                    ]]. TPBI's Financial Stmts., Admin. R. Con. Doc. 40 [Pub. Doc. 79], at 3, 18-19. The statements show that [[                                                  ]] in 2010. Id. at 3, 18-19. With regard to [[             ]], the statements show that [[



]]. Id. at 18. With regard to [[



                                                   ]] Id. at 19. Given these facts, Commerce's conclusion that TPBI's asset sale gain was entirely attributable to the routine disposition of production-related assets implies that TPBI sold assets at a price nearly [[    ]] the cost that it initially paid for them, generating a gain of more than [[  ]] times the assets' depreciated book value. See Reply Br. of [the Domestic Producers] in Supp. of their Mot. for J. on the Agency R., ECF
                                         (footnote continued)

Case 1:11-cv-00408-DCP   Document 82   Filed 04/10/13   Page 13 of 20
Consol. Court No. 11-00408                                                Page 13

Commerce's explanation that TPBI's asset sale gain was properly included in the G&A expense calculation because the record contains no evidence to suggest that these sales were unrelated to general manufacturing operations does not adequately address the evidence emphasized by the Domestic Producers. See I & D Mem. cmt. 1 at 5-6.[15]  Accordingly, Commerce's explanation fails to take into account evidence that fairly detracts from the reasonableness of its conclusion; it is therefore not supported by substantial evidence. See Univ. Camera, 340 U.S. at 488.

Because Commerce's decision to include TPBI's asset sale gain in the G&A expense calculation (based on a finding that this gain was attributable to the routine disposition of production-related assets) was not supported by substantial

---

No. 75, at 5-7.  As the Domestic Producers suggest, the reasonableness of this conclusion is fairly undermined by the greater likelihood that the [[        ]] baht gain was generated almost entirely from the sale of [[
                    ]]. See id.  As Commerce has previously explained, gains on sales of assets that do not correspond to a company's manufacturing or selling capabilities – such as gains or losses from the sale of land or other investments – are not included in the G&A expense calculation. See, e.g., Polyethylene Terephthalate Film, Sheet, and Strip from Korea, Issues & Decision Mem., A-580-807, ARP 08-09 (Nov. 19, 2010) cmt. 3 at 6.

[15] As this gain was not included in the G&A expense calculation prior to the filing of administrative case briefs below, both Commerce and the Domestic Producers were first apprised of TPBI's request to include this gain from TPBI's case brief. See TPBI's Case Br., Admin. R. Con. Doc. 45 [Pub. Doc. 88], at 4.  Thus this issue may have been under-developed in the administrative proceeding below.

evidence, it is remanded for further consideration, consistent with this opinion.

IV. <u>Landblue's Constructed Selling Expenses</u>

The Domestic Producers also object to Commerce's selling expense calculation when constructing a normal value for Landblue, another respondent in this review. Domestic Producers' Br. at 10-15.[16]  Specifically, although the surrogate financial statements used to construct Landblue's selling expenses did not separately report direct and indirect selling expenses, Commerce decided to treat these surrogate statements as though they were comprised of the same ratio of direct to indirect selling

---

[16] Because Commerce found that Landblue had no viable home or third-country market, see I & D Mem. cmt. 5 at 13, Commerce constructed a normal value for Landblue's merchandise. See id.; 19 U.S.C. §§ 1677b(a)(4), 1677b(e).  When constructing normal value pursuant to Section 1677b(e), Commerce includes, *inter alia*, an amount for selling expenses "in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(2)(A).  Where, as here, actual data with respect to this amount are not available, Commerce is authorized to use (i) the respondent's selling expenses in connection with the production and sale of "merchandise that is in the same general category of products as the subject merchandise"; (ii) "the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review"; or (iii) "the amounts incurred and realized for selling . . . expenses . . . based on any other reasonable method." Id. at § 1677b(e)(2)(B).  Here, Commerce decided to use selling expense data derived from another company's publicly available financial statements. I & D Mem. cmt. 5 at 13.

expenses as Landblue's actual experience. I & D Mem. cmt. 5 at 14.[17]

Relying on its "longstanding practice not to make adjustments that may introduce unintended distortions into the data rather than achieving greater accuracy,"[18] Commerce concluded that disaggregating and excluding a presumed portion of the surrogate's expenses from Landblue's selling expense calculation would avoid distortion and thereby achieve greater accuracy. See I & D Mem. cmt. 5 at 13-14.[19] Commerce decided that it was reasonable to assume that the nature and proportion of the surrogate's direct and indirect selling expenses were

---

[17] See I & D Mem. cmt. 5 at 13 ("[I]t is [Commerce]'s practice to exclude direct selling expenses in the calculation of selling expenses [when constructing normal value]."); Oil Country Tubular Goods ('OCTG'), Other Than Drill Pipe, from Korea, Issues & Decision Mem., A-580-825, ARP 03-04 (Feb. 27, 2007) cmt. 2 at 7 (excluding surrogate's freight and "various types of movement expenses" from a respondent's constructed selling expenses because these direct expenses "are incurred after [the merchandise] leaves the factory") (relying on 19 U.S.C. § 1677b(e)(3)).

[18] I & D Mem. cmt. 5 at 14 (relying on Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, Issues & Decision Mem., A-570-924, ARP 08-09 (Feb. 14, 2011) ("Film from the PRC") cmt. 1). See also Certain New Pneumatic Off-the-Road Tires from the People's Republic of China, Issues & Decision Mem., A-570-912, ARP 08-09 (Apr. 18, 2011) cmt 11 at 23 ("Because [Commerce] cannot go behind line-items in the surrogate financial statements, it is [Commerce]'s longstanding practice not to make adjustments that may introduce unintended distortions into the data rather than achieving greater accuracy . . . .").

[19] See supra note 17.

similar to Landblue's simply because the surrogate ("Thantawan") was "a Thai producer of similar merchandise, has a similar customer base, and operated with a profit." Id. at 14.

Landblue, however, exported all of its merchandise during the period of review, whereas no evidence suggests that the same is true of Thantawan. See I & D Mem. cmt. 5 at 13-14. Because Landblue exported all of its merchandise, its actual direct selling costs (e.g., freight) are likely to be significantly higher than those of a company selling largely within its home market.[20] And as "Thantawan's total selling expenses do not provide details on whether the expenses are direct or indirect in nature," I & D Mem. cmt. 5 at 14, Commerce merely presumed – based solely on the possibility that some (unknown) portion of Thantawan's selling expenses may have been comprised of direct expenses – that introducing Landblue's (export-based) direct expense ratio into the calculation of

---

[20] See Domestic Producers' Br. at 11 (emphasizing that "Landblue's direct selling expenses [were] comprised [[                    ]]") (citing Ex. 2 to Landblue's Supp. Financial Submission (June 22, 2011), Admin. R. Con. Doc. 43 [Pub. Doc. 82]). Commerce's vague explanation – that Thantawan's direct selling expense ratio was likely to be similar to Landblue's because Thantawan was "a Thai producer of similar merchandise, ha[d] a similar customer base, and operated with a profit", I & D Mem. cmt. 5 at 14 – neither addresses this argument nor refers to any evidence to the contrary. See id.

constructed value was more likely to result in greater accuracy than further distortion. See id.[21]

Because unfounded assumptions are not evidence, Commerce's decision that adjusting Thantawan's selling expenses to reflect Landblue's own direct expense ratio would avoid distortion and achieve greater accuracy is not supported by a reasonable reading of the evidence in the record.  This matter is therefore remanded for further consideration, consistent with this opinion.

V.   Landblue's Constructed Profit

Finally, the Domestic Producers claim that Commerce improperly constructed Landblue's profit[22] from publicly

---

[21] Compare with Coated Free Sheet Paper from Peoples Republic of China, Issues & Decision Mem., A-570-906, Investigation (Oct. 17, 2007) cmt. 4 at 28 ("[B]ecause [Commerce] does not know all of the components that contribute to the costs of a surrogate producer, it cannot be certain of the individual components which comprise the various line items in surrogate financial statements.  Therefore, adjusting those statements may not make them any more accurate and indeed may only provide the illusion of precision.") (citation omitted). See also Film from the PRC cmt. 1 (relied on in I & D Mem. cmt. 5 at 14) at 7 ("[Commerce]'s practice is to not make adjustments to [surrogate] financial statements data, as doing so may introduce unintended distortions into the data rather than achieving greater accuracy.") (internal quotation marks and citation omitted).

[22] See supra note 16.  When constructing normal value pursuant to Section 1677b(e), Commerce includes, inter alia, an amount for "profits, in connection with the production and sale
(footnote continued)

available Thai surrogate information, rather than using TPBI's confidential information. See Domestic Producers' Br. at 15-16 (emphasizing that, unlike TPBI's financial statements, the surrogate financial statements used to construct Landblue's profit did not disaggregate profits attributable specifically to sales of foreign like product in Thailand).  But because TPBI was the sole other respondent selected for individual examination in this review,[23] Commerce could not have relied on TPBI's financial statements without revealing TPBI's business-proprietary information in contravention of the administrative protective order. Cf. Polyethylene Retail Carrier Bags from Thailand, Issues & Decision Mem., A-549-821, Investigation (June 18, 2004) ("Bags from Thailand Investigation") cmt. 4 at 21 ("[B]ecause there is only one other respondent in this case, [Commerce] could not calculate . . . profit based on [actual amounts realized by the other respondent] because [doing so] would reveal the business-proprietary information of the other respondent . . . ."). Accordingly, Commerce reasonably determined that relying on TPBI's profit information was not an

---

of a foreign like product, in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(2)(A).

[23] See Final Results, 76 Fed. Reg. at 60,000.

Case 1:11-cv-00408-DCP   Document 82   Filed 04/10/13   Page 19 of 20
Consol. Court No. 11-00408                                              Page 19

available alternative.[24] See Geum Poong Corp. v. United States, 25 CIT 1089, 1092, 163 F. Supp. 2d 669, 674 (2001) (holding that Commerce properly determined that an alternative was unavailable where it would impermissibly reveal a respondent's proprietary profit ratio).  This determination is therefore affirmed. See id.

## CONCLUSION

For all of the foregoing reasons, Commerce's Final Results are sustained except with regard to 1) Commerce's decision to include TPBI's asset sale gain in the calculation of TPBI's G&A expenses; and 2) Commerce's adjustment of the surrogate financial statements used to construct Landblue's selling expenses to reflect Landblue's own direct to indirect selling expense ratio.  As explained above, these issues are remanded for further consideration, consistent with this opinion.  Commerce shall have until May 20, 2013, to complete

---

[24] Although Commerce acknowledged that the Domestic Producers "reiterate[d] their argument that [Commerce] should base the profit ratio for Landblue on the profit rate it calculate[d] for TPBI," I & D Mem. cmt. 4 at 11, the agency did not specifically address this argument in explaining its decision to continue to base Landblue's profit calculation on publicly available information from a Thai surrogate. See id. at 12. As this argument was considered and addressed in detail in the underlying investigation, however, see Bags from Thailand Investigation cmt. 4 at 21, it is reasonable to infer that Commerce based its decision in this review on the same reasoning as that supporting its decision regarding the same issue in the prior proceeding.

and file its remand results.  Plaintiffs and Defendant-Intervenors shall have until June 3, 2013, to file comments. The parties shall have until June 10, 2013, to file any reply.

    It is SO ORDERED.

                        __/s/ Donald C. Pogue_____
                        Donald C. Pogue, Chief Judge

Dated: March 19, 2013
       New York, NY